## Case No. 17,154.

WARD et al. v. The FASHION.

[Newb. 8; [1] 6 McLean. 152.]

District Court, D. Michigan. Oct., 1854.

COLLISION BETWEEN STEAMER AND SAIL — PROOF OF FAULT — INEVITABLE ACCIDENT — ERROR IN EXTREMIS — PLEADINGS AS EVIDENCE — WEIGHT OF TESTIMONY—PROTEST—NAUTICAL PHRASES— EXCESSIVE SPEED IN STEAMERS.

1. In case of a collision. between a steamer and a sail vessel, in which the owners of the former libel the latter. the libelants must not only show fault in the sail vessel, but all precautionary measures. on their own part. to avoid the danger to which she was exposed.

2. When a collision is deemed inevitable. an injudicious order. given in the excitement and alarm of the moment. is not to be considered

[1] [Reported by John S. Newberry, Esq.]

the only cause, even if deemed a fault. should the antecedent negligence and conduct of the one party have placed the other in a situation where there was no time for judicious action.

3. Where no fault can be found on either side, the collision will be deemed an inevitable accident.

[Cited in Austin v. New Jersey Steamboat Co., 43 N. Y. 81.]

4. Where a collision occurs from inevitable accident, without the negligence or fault of either party, each should bear his own loss.

5. Allegations in pleading are admissions by the pleader, and need no proof, unless denied and put in issue: and as against the pleader, will be taken as matter conceded.

6. A witness swearing that he thought a particular order was given, and to his belief that it was obeyed, is not contradicted by testimony positively averring that such an order was not given.

7. The testimony of a witness should not be rejected, because in a hurried conversation, immediately after the collision, he gave a different statement as to a particular fact, from that positively sworn to in court.

8. The protest of the captain and crew, made the morning after the collision, when admitted in evidence, may be considered as evidence corroborative of the testimony of the witnesses in court, when, as to all material facts, they correspond.

9. Doubtful words in a statute, if not scientific or technical, are to be interpreted according to their familiar use and acceptation. The phrase "going off large" is nautical, and signifies having the wind free on either tack.

10. Since the introduction of steam in the propulsion of vessels, the rule of navigation has been enlarged, and steamers are required to use all their power and care, under all circumstances, to keep clear of sailing vessels. The former can be controlled and guided by human skill; the latter are governed by the wind.

[Cited in The Sunnyside, Case No. 13,620.]

[Cited in Parrott v. Knickerbocker & N. Y. Ice Co., 46 N. Y. 368.]

11. Every precaution must be taken by a steamer to avoid a collision with a sail vessel, and the timely slackening of her speed is a necessary precaution at night, when passing through a fleet of sail vessels anchored at the mouth of a river. Under such circumstances, a mere conformity with the rules of navigation will not excuse the steamer.

12. A rate of speed in steamers, which, under the circumstances, necessarily endangers the property of others, is unjustifiable, and makes the owners responsible for the consequences.

[This was a libel by E. B. Ward and S. Ward, owners of the steamboat Pacific, against the brig Fashion to recover damages sustained by a collision.]

H. H. Emmons, G. V. N. Lothrop, and J. S. Newberry, for libelants.

1. In the case of the Woodrop Sims [2 Dod. 82], cited in Abb. Shipp. 229, Lord Stowell stated four classes of collision in the English admiralty: 1st. Where the collision is without fault on either side, as by inevitable accident or vis major; there the loss is left where it fell. 2d. Where both parties are to blame; there the whole loss is put together and divided in equal moieties, each party bearing half. Rogers v. The Rival [Case No. 11,867]. This is also the rule where there is actual fault, but it is inscrutable, that is, uncertain on which side it lies. The Sciota [Case No. 12,-508]. 3d. Where the fault is with the suffering party alone; in this case he must bear his own loss. 4th. Where the fault is with the other party alone; then the offending party must respond to the injured party in full damages. The first proposition as laid down, it will be observed, is a mere dictum, and is not necessarily law in our courts. On questions of jurisdiction and admiralty law, our courts are not bound by the English courts, but may go to the great sources of admiralty law to be found in the codes of the commercial states of Europe. See Ben. Adm. c. 12. "Resume." Such is the doctrine of the United States courts. The Jefferson, 10 Wheat. [23 U. S.] 428; Waring v. Clarke, 5 How. [46 U. S.] 441; The Genesee Chief, 12 How. [53 U. S.] 443. The first proposition of Lord Stowell we submit, is not law in this country. (1) Because it has never been so adjudged in this country. (2) By the laws of most of the maritime states of Europe, the loss was divided in case of inevitable accident. See Abb. Shipp. 229. Such was the law of Valin. Oleron. Hanseatic ordinance, Vinnius and Stypmann, and the French ordinance. (3) Because one of the most accomplished and experienced of the American admiralty jurists has decided otherwise. The Sciota [supra]. But in the case at bar we claim the brig Fashion to be solely in fault.

II. It is the duty of a steamer, all other things being equal, to port her helm, and go to the right, on meeting a vessel coming from the opposite direction. Story, Bailm. § 611.

III. Where either party has neglected any ordinary precaution, or varied from any right or duty. they are presumptively liable. 1 Conk. Adm. Prac. 303; [Newton v. Stebbins] 10 How. [51 U. S.] 605; [St. John v. Paine] Id. 584. (1) The showing a green light by the Fashion when on the larboard tack, was an ordinary—nay more. a statutory prescribed. precaution. Laws Cong. 1847; Bulloch v. The Lamar [Case No. 2,129]. (2) A sailing vessel meeting a steamer has a right to keep her course. and it is her duty to do so. Conk. Adm. Prac. 308, 309; 2 Hagg. Adm. 173. Corollary first: The Fashion was on her larboard tack. not showing a green light; she is therefore in fault. Corollary second: The Fashion changed her course and headed obliquely across the channel.

IV. The libelants may recover though some fault is attributable to them. 1 Greenl. Ev. § 232a; Butterfield v. Forrester, 11 East, 60; Bridge v. Grand Junction R. Co., 3 Mees. & W. 244; Davies v. Mann, 10 Mees. & W. 546; Barrett v. Williamson [Case No. 1,051].

A. D. Fraser, James A. Van Dyke, and William Gray, for respondents.

To entitle the libelants to recover, they must show negligence on the part of the respondents, and entire vigilance, and no neg-

ligence on their own. Abb. Shipp. 501 (top paging); also, Id. 606; 1 Cromp. & M. (1832) 20; 38 E. C. L. 252. The libelants must show fault on part of defendants. The Atlantic & Ogdensburgh [Case No. 17,158]; Story, Bailm. 609, note; 3 Kent, Comm. 231. The speed of the Pacific was too great under the circumstances, and puts her officers in fault. 2 W. Rob. Adm. 9; Id. 271; 3 W. Rob. Adm. 76; 2 W. Rob. Adm. 2, 202, 379, 426; 3 W. Rob. Adm. 288. It is a mark of suspicion that the libelants did not offer their protest in evidence. 3 W. Rob. Adm. 295; 2 W. Rob. Adm. 318. In conflict of testimony the presumption is that the respondents did their duty. 2 W. Rob. Adm. 245.

WILKINS, District Judge. This is a cause of collision between a steamer and a brig, at the mouth of the river Detroit. The libelants were the owners of the steamer Pacific, and exhibited in their bill the following allegations, viz.: "That the said steamboat, of the burthen of 500 tons and over, on the 26th of May, 1853, sailed from the port of Detroit with a large load of passengers and a small cargo of merchandise, on a voyage to the port of Cleveland, in the state of Ohio; that, in the evening, when about a mile and three-quarters below the port of Malden, and about three-quarters of a mile below the Malden light-house, and near the mouth of the river, while running her usual track, and only at the rate of five miles an hour, because the night was dark, without a moon, and it thus being impossible to distinguish a vessel at more than about twice the length of the said steamboat distant; and, furthermore, because the master of the steamboat thus slowed the speed of the said steamboat, in order to pass a vessel about five or six hundred feet above the brig Fashion; the master being on watch and on the look out, descried a small light ahead, and soon discovered a vessel approaching the steamer he commanded, dead ahead, and apparently about three hundred feet distant, which was but twice the length of the said steamboat; that as soon as he discovered the said brig Fashion thus approaching the steamer, he ordered his helm to be put 'hard a-port,' designing to pass to her right, and leave her on his larboard side; that the helm of the steamer was accordingly put 'hard a-port,' and so kept until the said steamboat had lapped her bow upon said vessel about twenty or thirty feet; and that when he perceived the Fashion was about to strike the steamer, he ordered his helm 'hard a-starboard,' in order to throw his stern off and avoid a collision, which was accordingly done, but the said brig struck the said steamboat with her bow about midships, carrying away the wheel-house, the kitchen and pantry, with its crockery and furniture, and also the wheel beams, deck frames, pillar block, and breaking the wheel of the said steamboat."

The libel further exhibits, that at the time the light of the Fashion was first seen, the steamer Pacific "carried a bright light at the top of her pilot-house, a red light on her larboard side front of the wheel-house, and a green light on her starboard side opposite the red; and that the said lights remained in their positions burning, when the brig struck the steamer, and that they could easily have been seen from the Fashion for a long time before, and in season for her to have avoided a collision."

It is further alleged in the libel, that "when the Fashion was first seen, she was so near the Canada shore, that the steamer could not safely pass between her and the shore; that when first discovered by the Pacific, she was sufficiently near for those on the steamer to see her exact course, and that her bow pointed from the Canada shore towards the middle of the river; that, when the Pacific was nearing her, and about to pass her on the right, instead of hugging the said shore, or putting her helm to larboard, as she was bound to do, or instead of keeping on her course, she omitted to do either, but put her helm to the starboard, and thereby throwing her bow out from the shore, across the track of the steamer, and by reason whereof the collision occurred; that the orders 'to starboard' were distinctly heard given on board of the brig, and that, in obedience thereto, she bore out from the shore across the track of the steamboat, until just as the bow of the brig was about to strike the steamer, when the order was given 'to port her helm and bear away,' which was too late to avoid the collision."

After thus succinctly narrating the circumstances attending, and the immediate cause producing the collision (which, as the libel was prepared and filed within four days after the events described, and when the facts were then fresh in the memory of the captain of the steamer and his crew, may be fairly considered as their view of the facts at the time), the libel proceeds to confirm this view of the transaction, by the recital of the admission of the captain of the brig, that his vessel was in fact starboarded, as thus represented; and that the collision was consequently occasioned by the carelessness and mismanagement of the captain and crew of the Fashion, in not putting her helm to the larboard, or otherwise continuing her course up the river on the Canada side of the channel.

The respondents deny that the collision was occasioned by the fault of the brig; but directly charge the same to the carelessness and mismanagement of the steamer, averring that it was occasioned by the steamer's attempting to cross the bows of the said brig, when she should have continued her course and gone to the starboard. They further deny, that the brig was pursuing a course upward near the Canada shore; and aver, that the brig, being on a voyage from the port of Buffalo to Chicago, entered the mouth of the river Detroit, from Lake Erie, about 8½ o'clock in the evening of the day when the

collision occurred; that having by the compass brought the light-house to bear from their vessel north by east, they pursued a course up the river west of mid-channel, direct for the Bois Blanc light-house; that they continued such course without material variation; that on entering the mouth of the river, all their crew, ten in number, were summoned upon deck, and stationed at the braces and other suitable places, so as easily to manage the vessel in case of emergency; that she was staunch, strong, well manned and equipped; that she had a signal lamp burning and suspended over the pawl bits, visible to those approaching; that in addition thereto, a man with a large globe lamp was stationed forward of the railing; that when she was two and a half miles up the river, and a quarter of a mile from the light-house, and about half a mile from the Canada shore, her master, who was on the look out, discerned the light of the Pacific coming down the river about half a mile off; that both the lights of the steamer were then visible, and continued so, until she approached to within forty or fifty rods of the brig, when the larboard light disappeared and continued so until within twenty rods; that at this time she was from two to three points to the starboard of the said brig's bow, and was then pursuing a course which would have carried her some fifteen rods to the starboard, and prevented the collision; that there was an abundance of room then between the brig and the Canada shore, for the steamer to pass with entire freedom and safety, the river being about two miles wide in that locality; that the said steamer here suddenly changed her course, and her larboard light again appeared; that the Fashion was then sailing up the river at the rate of a mile and a half an hour, and on the same course with which she had entered, and that her course was not altered until a collision with the Pacific appeared inevitable, at which time her helm was ordered a-port to ease off the blow of the steamer; that within a minute after the re-appearance of the larboard light of the Pacific, she ran across the course of the brig, striking her larboard bow, carrying away her jib-boom, bowsprit, and breaking through her larboard bow; that the speed of the said steamer was, at the time, unchecked. The respondents, therefore, fully deny that the collision complained of, could have been avoided by the brig Fashion, but affirm that it was caused by the sudden and improper change made in the course of the steamer. They deny further, putting the helm of the brig to the starboard, and aver that she only changed her course at the time, in the direction and to the extent and for the purpose previously stated; and further affirm that no order to starboard was given by the master or any one on board said brig, and that no collision would have occurred, had the Pacific kept her course to the Canada shore, or stopped her engine when the danger first became apparent.

The issue of fact, thus presented by these allegations of the respective parties, comprehends, therefore, the affirmation of the libelants that the collision was caused by the unskillful starboarding of the Fashion, when the vessels approached each other; and the denial of the same by the respondents. But assuming the fact to be according to the statement of the libel, and that such an order was given and obeyed by the brig, it by no means exonerates the steamer from fault, and attaches responsibility to the respondents, unless the alleged consequence of such order was solely attributable to such alleged false movement of the brig. The libelants must show that their vessel performed the duty which devolved upon her under the existing circumstances, in adopting all precautionary measures to avoid the danger to which she was exposed. They are not only called upon to establish fault in the respondents, but to prove ordinary care and diligence on their own part. At the moment a collision is apprehended to be inevitable, an injudicious order, given in the excitement and alarm of the moment, is not to be considered as the only cause, even if deemed a fault, should the antecedent negligence and conduct of the one party have placed the other in a situation where there was no time for judicious action. Bulloch v. The Lamar [Case No. 2,129]; [The Genesee Chief v. Fitzhugh] 12 How. [53 U. S.] 461.

Hence the inquiry of the court embraces the consideration of other facts than those composing the issue specified in the libel and answer. The pleadings admitting a collision, the principal inquiry is, whether it was the result of inevitable accident, beyond the control of human care and skill, or, if not, which vessel was in fault; or, were both in such fault as would call for an equitable apportionment of the damages? It was clearly not an event caused by a sudden storm, or, any such vis major as caused the vessels to be driven against each other, and which human foresight could not have prevented. Yet, if there can be no fault found by the testimony on either side, it will nevertheless be considered as an inevitable accident. The steamer was on her usual evening trip to Cleveland, Ohio, and the brig on her voyage to Chicago, had entered the mouth of the Detroit river, in the vicinage of which and within the range of a mile of the light-house, a fleet of fifty or sixty sail vessels, bound upward, were detained by unfavorable weather. In the language of Captain Shepherd, of the Hope, "The vessels were so thick in the channel, and the night so dark, that it was a difficult matter for a steamer to steer safely through them, and required the greatest precaution."

The testimony, which is principally applicable to the other points involved, is not only voluminous, but greatly contradictory. This is necessarily incidental to all cases of this description. The witnesses, usually the crews of the colliding vessels, are not at all times the most reliable; and, viewing the leading incidents from

different and ever varying positions, a correspondence in their testimony cannot always be expected. With much care and attention, I have laboriously examined and studied the facts in the case, and will not undertake to reconcile the marked discrepancy in the evidence. Certain prominent facts are free from all doubt, and on them mainly will the decision of this court depend. Other facts are left in uncertainty, by the witnesses on the one side contradicting each other on material points, widely differing in matters of judgment, as to time, place, distance, and the character of the night; and all of them, almost with one accord, positively affirming the leading fact in the controversy, which is flatly, and as positively denied by all the witnesses on the other side.

Before we proceed, however, to an examination of this testimony, it would be well to notice four very material facts, placed on the record of the case by the libel. Allegations in pleading, are admissions by the pleader, and need no proof, unless denied and put in issue; and as against the pleader, will always be taken as matter conceded. These facts are: 1. The night of the collision was very dark, and so dark as to be impossible to distinguish objects at more than twice the distance of the Pacific. 2. The speed of the Pacific was slackened to five miles an hour, in order to pass a vessel about five or six hundred feet above the brig Fashion. 3. Captain Goodsell, of the steamer, first discovered the brig Fashion approaching the Pacific dead ahead and at the time about 300 feet off. 4. That as soon as he discovered the Fashion, thus approaching his vessel and at this distance, 300 feet, he first ordered his helm "hard a-port," and kept her so, until she lapped her bow upon the brig about twenty or thirty feet; and then perceiving that the Fashion was about to strike the steamer, he ordered his helm "hard a-starboard," in order to throw his stern off, which was done, and then the collision occurred.

I. The first proposition presented by the pleadings and the proofs is, was the collision the result of the fault, or the unskillful conduct of the officers and crew of the Fashion? It is argued on the part of the libelants, that the Fashion, in her onward course up the river, closely hugged the Canada side of the channel; that she was on this course when first seen from the Pacific; that she continued on this course until nearly opposite to, although somewhat below, a house on the Canada shore designated as the Elliot House, and stated by Mr. Elliot to be "about sixty feet below the light-house"; that the Pacific having a minute before slackened her speed, to avoid a collision with the vessels lying in front of the light-house, was slowly proceeding onward in mid-channel, when the Fashion, suddenly changing her course for the American side, recklessly crossed the track of the steamer, and by unskillfully putting her helm to the starboard, rendered a collision unavoidable. Such a state of facts, if sustained by proof of every precautionary measure taken by the steamer to pass in safety, would certainly fully exonerate the steamer, and render the respondents liable to the amount of the damage incurred. Is such a view of the case maintained by the preponderance of the evidence? I think not. While no two of the crew of the Pacific agree as to the relative position of the Fashion to the Hope and to the Canada side; and Smith Holt, the wheelsman, locates the Hope "in mid-channel, tailing towards Canada"; while Noble, the clerk, says, "She seemed to be coming up the eastern shore, and did not alter her course until a minute before the collision"; while Elliot swears "that the point of collision was further off in the stream and near the middle of the channel"; while Goodsell states that he could not doubt as to the position of the vessel, and that her course was up the river on the Canada side, and about 250 feet from the shore; and in cross-examination, invalidating the strength of this testimony, by swearing that the collision occurred half a mile below the island, and consequently locating the Hope at a greater distance from the Canada side, and the light-house, than the same is fixed by Shepherd and Dumont; while such glaring discrepancy weakens the position of the libelants in this respect, the captain, the two mates, the helmsman and seamen, numbering nine in all, and constituting the entire crew of the Fashion, clearly, unitedly and emphatically testify to her course from opposite Bar Point upward, west of mid-channel in a specified direct bearing for the light-house. And in this they are mainly supported by Wolf of the Walbridge, and Marshal Capron of the Blossom, the one following and the latter preceding the Fashion in the same course, and passing unobstructed up the stream to the light-house point, between the Hope and the so-called American side shortly before the collision, the crash of which was heard distinctly on her decks.

If, then, taking the Canada side of the channel and continuing in the same until the moment of collision, and putting the helm at that crisis to the starboard, thereby suddenly turning her bow to the left and across the river, is the fault of the Fashion, I cannot, from all the consideration I have given the evidence, so find that fact. The libelants' witnesses by no means agree with each other as to hearing the order "to starboard," or from what quarter it proceeded; and those of them who testify to such a fact, are positively contradicted by the captain and the entire crew of the Fashion, who must have heard such an order had the same been given, and must have been conversant of the fact had such an order been obeyed by the vessel. They could not be mistaken; while it is probable that those on board the steamer were so, hearing such a shout from the Walbridge, and from the appearance of the Fashion in "easing off her main sheet." If the fact was so, and such an order was given and obeyed, the captain, the mates, the helmsman, and the seamen of the Fashion have knowingly and corruptly sworn to a falsehood, material in this controversy, and which would require of

this court, so believing the fact, to direct their recognizance to respond to a criminal accusation. Not so in regard to Goodsell, Fish, Dumont, Noble, and the wheelsman, Holt. There is a mental reservation, or a cautious modification in their testimony, which, however morally inexcusable if the fact was otherwise, would be protection of them on an indictment for perjury. Thinking such an order was given on board the Fashion, and believing the brig then swinging to the left, is not an oath contradictory to the fact, that no such order was given, and that no starboarding nautically considered ever occurred.

Captain Goodsell says, in his testimony in chief: "I heard them on board the brig sing out 'Starboard,' and then 'Hard starboard,' and saw the Fashion swing towards our vessel;" and in cross-examination, he says, "I think she put her helm to starboard, when we put our helm to port." All this may be consistent with the fact that the Fashion was not put to the starboard. Fish did not hear the order to starboard, but says, "The Fashion seemed to be swinging towards us, after Goodsell gave the order 'to port,' and then it was too late for either vessel to have avoided a collision"; corresponding with the statement of Kennedy Andrews "that the Fashion, at the time, eased her main sheets," which would appear to those on the steamer, as if she was starboarding. Dumont says "that he heard the order 'to starboard,' but the Fashion was so close, that he couldn't say whether she swung or not." Noble says, "the Fashion seemed to be coming up on the Canada side; heard the order 'Hard a-port' on the steamer, and observed an alteration in the course of the Fashion towards us, and immediately the collision occurred." And Holt says, "I think the Fashion luffed up just before the collision, and changed her course, heard the order 'to starboard,' but can't say the sound came from the Fashion." All of which testimony amounts not to the weight of a spider's thread, when contrasted with the unequivocal denial of the fact by nine witnesses, who best knew of the circumstance, if it occurred, and still more so when taken in connection with the testimony of Wolf, that he, immediately before the collision, gave such an order on board of the Walbridge, whose position was directly astern of the Fashion. And were I to accept the equivocal affirmation of the libelant's witnesses on this point, thus explained by the order given on the Walbridge, and reject the positive and direct denial of the respondent's witnesses, I should give a preponderance to doubt over certainty, and establish a new rule of evidence for the discovery of truth. I am obliged, therefore, to say, that my examination of the evidence, in regard to this very serious conflict between the witnesses, has led me irresistibly to the conclusion, that no such order was given on board the Fashion, and therein she was not in fault.

Heretofore I have considered the course and conduct of the Fashion, principally with the light shed thereon by the crew of the steamer.

Their testimony certainly does not make out the case, as exhibited in the libel. Nor is much strength superadded thereto by Simonea and Guiteau; the latter of whom, by his conduct on the stand, did not commend his oath to the favorable regard of the court. We will presently consider the weight to which their evidence is entitled, with reference to the object for which it was offered.

During the recess of the day, when the libelants closed their testimony in chief, my mind was impressed with the conviction that they had not presented a case so free from doubt, as to warrant a decree in their favor. With that conviction, I was disposed to stop the further investigation; but, conceiving that the examination of the crew of the Fashion might lead either to an amicable adjustment by the parties, or to a decree on the basis that the real facts of the case were inscrutable, I permitted the hearing to proceed. But the testimony of the respondents gives an entirely different view of the transaction, and, if worthy of credence, completely exonerates them from all liability, leaving only for the determination of the court, the credibility of the witnesses who testify to the facts. It establishes that the brig Fashion was on the right course, as confirmed by Captain Willoughby, bearing from off Bar Point north by east, and heading for the light-house; that that course was kept without variation, except in passing the Walbridge, and the shoal which made out from the head of the Island; that she was properly manned; that she had a proper look-out; that she used extraordinary precautions to escape a collision with other vessels; that she added to the usual lights required by the law, the captain placing a man with a globe lamp outside of the railing; that, with the wind lightly freshening from the west, she crept up the stream at less than two miles an hour; that every man of her crew was at his post; and that she made no injudicious movement whatever, continuing on her course until colliding with the Pacific. Such is the substance of the testimony of Captain McKee, corroborated in every important particular by Andrews, Salmon, Rogers, Flack, Mason, Sheely, and others. How has it been impeached? I must confess I place but little reliance upon the mathematical argument, or that which has been adduced to show the inconsistency of this testimony with natural truth. Such argument is based upon a misapprehension of the testimony as to the position of the other vessels; for displace the Hope a few rods further west or south, or farther from the light-house (localities about which all the witnesses for libelants greatly differ, and no two agree), locate the Deer further up or down, and change but a few feet the witness Elliot, and the whole argument as to the place of collision falls to the ground. It requires but a little variation in the lines drawn upon the chart to demonstrate this. Besides, if the witnesses locating these objects (no one of which can be safely considered as a fixed object but Elliot's house and the Island light),

had satisfactorily agreed in relation to the same, which is not the case, it would only amount to the testimony of three witnesses hypothetically contradicting that of nine; for Capron and Wolf, in this respect, sustain the crew of the Fashion, who place the point of collision below the Hope, and some thirty rods off, and the course of the Fashion at the time westward, or more towards the American side of the channel.

Neither can I accede to the opinion that, because Chart B, drawn by Mr. Campeau, represents a straight line from the point of starting, near Bar Point, to the light-house, and these witnesses testified to its accuracy, as representing the mouth of the river, and the course and position of the vessels in its vicinage, that, therefore, they swore to such a straight line as the course of the Fashion, which would consequently be inconsistent with keeping the light constantly in view over their larboard bow, when steering by the compass north by east. Their testimony was in substance, "that having fixed the compass, and taken the bearing north by east in starting up the river, their course was made direct for the light-house, sailing or heading direct for it, until coming near the shoals, when they sheered off a little to avoid them, resuming again their course by the light." In the language of the captain, "When the light bore north by east, we kept away, steering directly for the light." In pursuing this course, it is true, the Fashion would be continually nearing the eastern side of the channel as she advanced up the stream, because, as Captain Willoughby testified, "The Canada shore protrudes more westwardly, and the channel contracts as we approach the mouth of the river, and as the point of starting was more or less west of the light-house." And here I must say that a careful examination of the testimony has corrected the mistake under which I labored for a short time during the able argument of the counsel of the libelants; that, in this respect, the testimony of McKee and his crew was as to an impossibility and, therefore, so to be considered. But, on review, I find instead of "keeping the light bearing a little over the larboard bow," the testimony is, that they kept the position of the Fashion directly ahead for the light, as is fully and intelligently explained by Andrews, the first mate, saying: "We kept away till we opened Bois Blanc light, a little on our larboard bow, and then, that is, after this, steered by the light and compass, the man at the wheel going by the light." And Flack, the helmsman, swearing "that he kept his eye on the light, and kept it as right ahead as he could see."

I was very careful in noting the testimony as given by McKee, Andrews, Flack and their companions, as to the course of the vessel, reading over repeatedly to them what I had written ere they closed their testimony, that I might not afterwards be misled; and I am satisfied their testimony is not obnoxious to the objection which has just been considered. But, it is furthermore urged, that McKee should at least be discredited, because, as is charged in the libel, he stated on the following day, when he arrived in Detroit, "that his vessel was starboarded," and that such a statement differs from the testimony he has delivered in court. That he told a different story on the occasion alluded to, is not so clearly established. The conversation he had with Mr. Thompson and others was a hurried one, just as he had landed, and when on his way to telegraph the owners; and it was an easy matter for them, under circumstances, to have misunderstood the purport of his language, or, for him unintentionally to have let fall a word that did not technically convey his meaning. Thompson, Montgomery, Fish and McDonald decline testifying to his using the term starboard, while only Murray and Goodsell, of the eight that were present, swear positively that such was his language. Goodsell had preceded him to Detroit, and given his version of the transaction, and yet the same remarkable want of coincidence between this witness and the first mate, Fish, which distinguished their testimony as to the relative position of the vessels, and their conduct at the period of collision, characterizes their testimony as to the strong point of this conversation. Goodsell swears positively that he said "he gave the order and starboarded his vessel," while Fish "will not be so positive about the word starboard being uttered," but, that he said "he thought that the Pacific would go between him and the Canada shore, and that he headed a little for the American shore, and gave her a wide berth on the Canada side"; which is not materially variant from McKee's testimony on the stand. The witness Thompson, however, places this matter of impeachment, I have no doubt, in its true light, as it occurred; and giving to his version its proper weight, it would not justify the entire rejection of McKee's testimony, on the ground taken by the libelants. With the change of one word, his narration of the transaction to Mr. Thompson, is but an epitome of his testimony in court, as I have recorded the same. He said to Thompson, "he saw the Pacific descending the river, he watched her to see her course, she seemed to change some as she approached, shutting out and opening, her lights"; from all of which he, McKee, concluded she was going to take the Canada side, and he, willing to give her a wide berth, "put to the American shore." But, that he told another story, is successfully rebutted by the protest, which, if not competent evidence as to any fact it contains, is at least evidence, that he and his whole crew, the morning after this conversation on the dock, entertained the same opinions, and narrated succinctly the same facts, to which they have testified in court; and so far raises the probability that the witnesses thus impeaching the memory or integrity of McKee, were clearly mistaken as to his meaning, if not as to his language. Where a witness is

sought to be impeached in this manner, by a number of others, it would be more satisfactory if those others could agree among themselves, or, that the memory of each had caught and retained at least the convicting word of the reported conversation. Moreover, the rejection of his testimony would in this case amount to nothing; it would not weaken the preponderance, as the same facts are testified to by Andrews, Sheely, Flack and the others; and if McKee has sworn falsely, they all have sworn falsely; and not only so, but their moral turpitude is magnified beyond the one offence of perjury, to a corrupt combination deliberately to swear, by whole cloth manufacture, to a tissue of falsehoods, to the injury of the libelants—a supposition too monstrous for judicial confidence. McKee might have a motive, in self protection, as between him and the others; but it is hard to imagine how his crew could be brought to such a stage of crime, without the appliance of the usual incentives to human action. The intelligent, demonstrative and conclusive evidence of Kennedy Andrews, was in all particulars corroborative of McKee; and Flack, the helmsman, was as direct as to the same facts as either; and my confidence in both of them, as witnesses, has not been impaired. The great point of controversy, in the impeachment of Captain McKee, is as to the course he ran, and the necessity he was under to order his helm a-starboard. If he was on the Canada shore, such necessity may be conceived possible; but if, on the other hand, he was on the American side of mid-channel, such an order would only tend to put his vessel unnecessarily more in that direction. Now, that McKee is right, is confirmed by a portion of the testimony of the libelants. Let a line be drawn through the river, from the starting place off Bar Point upwards, equidistant from both sides of the channel. Call the same mid-channel. Now, according to the testimony of Noble and Smith Holt, the wheelsman, the Hope lay in mid-channel, tailing, or with her stern towards the Canada side; Noble saying, "the Hope lay in mid-channel, and as we rounded her, we left her on our starboard side." The bow of the Hope, then, would of course be pointed to the American side. But Shepherd says, "that the Pacific, in passing, rounded the Hope." In doing so, her stern would of course tail or turn several points to the Canada shore, and consequently her bowsprit across mid-channel, would directly point down the river westward, towards the American shore. But Fish swears that the collision took place thirty-five or forty rods below the Hope; and Goodsell, that the Fashion was dead ahead, and consequently that distance in a line, drawn from and along her bow westward, places beyond controversy, according to the testimony of these four witnesses of the libelants, the point of collision on the American side of the channel; and therefore sustains McKee in the testimony he has given.

Thus disposing of this branch of the case, we are called upon to decide a two-fold objection which arises from the testimony of the respondents, viz.: 1. That the Fashion being on her larboard tack, as is contended, she did not display the signal light as required by the 5th section of the act of congress of 1849 [9 Stat. 382]. 2. That the ignorance of Captain McKee, as to the new regulations in regard to navigation by steamers, exhibits such a want of seamanship, as to prove that the Fashion was not well manned.

Apart from the consideration that the display of an erroneous light, is not made, either by the libel or the evidence, the cause of the collision, I am by no means satisfied that this objection is well taken under the provision of the statute. The language of the 5th section of the act of 1849, is as follows: "During the night, vessels on the starboard tack shall show a red light; vessels on the larboard tack, a green light; and vessels going off large, or before the wind, or at anchor, a white light." It would seem from the use of the conjunction "or," in the last branch of the sentence, that legislation designed to contradistinguish "going off large" from sailing "before the wind," and to direct the display of the white light under three contingencies. If so, the phrase, "before the wind," cannot be considered as definatory of "going off large." What then was meant by the latter contingency? Doubtful words in a statute, if not scientific or technical, are to be interpreted according to their familiar acceptation. But the words here are all technical, and have a nautical meaning in the science of navigation, with which, in the interpretation of a statute, it is presumed courts of justice are acquainted. No experts need be called on to interpret the law. Many terms and phrases are used in our law books, and reports in admiralty, that are not in common use out of that jurisdiction. Booms, and pawl bits, and cat heads, and braces, and aft, and abaft, and larboard, and starboard occupy a prominence in admiralty, and are all, in legal supposition, at least, known to the court. So in regard to the phrase under consideration; its definition is the interpretation of the statute. Congress designed to provide three signal lights, for five contingencies, and "going off large," and being "before the wind," and "at anchor" in the river, of a dark night, presenting a similar peril to approaching vessels ahead, have assigned them the same signal light as a warning. "Going off large" is having the wind free on either tack, properly termed a vessel "off large," because it is in her power to take a course to either side—starboard or larboard—proceed straight forward on her course, or return back to her anchorage, or to the point from which she started. In other language, she is free to the wind. She is not bound, but like a discharged debtor under the old insolvent system, who being at large, is at liberty to leave, as a free man, his prison bounds, and go whithersoever he

will. Was such the condition of the Fashion? McKee testifies, "that the wind on entering the river was W. S. W.; that at first it was very light, and scarcely sufficient to take them up the river, and that he had everything arranged to let go her anchor. But it soon blew a little stronger, and kept us moving slowly on our course." And Fish and Dumont both say, that when they first discovered her, "they could not tell whether she was at anchor or not." And Andrews says, "that they had aboard her larboard tacks"; and he and his companions, all testify, that the course of the brig was direct, without any change of helm or sails, and free to the breeze. Moreover, McKee swears, "that he had the regular signal light burning on the 'pawl bit,'" which, being the white light, and taken in connection with the evidence already quoted, shows that she was "going off large" with the wind on her larboard. Being, then, a vessel "off large," on a larboard tack, or, to use the phrase of Judge Nelson, in 10 How., "having on board her larboard tacks," she was not in fault in displaying, in such a contingency, her white light from the pawl bit.

2. Neither can the second objection, as to the brig not being well manned, be considered as of any force, unless the catastrophe can be fairly attributed to the ignorance of Captain McKee of the rules and regulations adopted by the board of inspectors, under the 29th section of the act of 1852 [10 Stat. 72]. The act itself, in its various provisions, is only applicable to vessels propelled in whole or in part by steam; and no special provision is made for promulging these "rules and regulations" to be observed by steamers, beyond "furnishing to each steamer two printed copies, to be kept in conspicuous places." The law did not go into operation, except as to the appointment and qualification of inspectors, and the licensing of pilots and engineers, until the 15th of January last; and there being no proof of these regulations being promulged until after the opening of spring navigation, the notice of the existence of such new rules, and, therefore, the knowledge of the consequent change as to lights, was limited to steam vessels. Excepting the application of the old maxim, that ignorance of the law is no excuse, it is not easily apprehended, how the ignorance of the captain of the brig as to these regulations, can be seriously deemed bad seamanship. Besides, he made no movement whatever founded upon his belief that the old regulations were still in force. He, his two mates, and his helmsman, swear, that they fixed their course and took their heading near two miles below, and kept it, without deviation, until the collision.

Such, then, being the preponderance of the testimony, I am constrained to determine, that I find no fault in the Fashion; because I find no material discrepancy in the evidence sustaining the defence—but much difference, both as to fact and opinion, between the witnesses called to sustain the libel. Neither am I able to say that McKee and his crew were mistaken or deceived as to the course and movements of the brig; but, on the other hand, if that to which they have testified be untrue, in the main or in any important particular, I must declare they are guilty of willful and corrupt perjury, and should not be permitted to escape with impunity.

Our next inquiry is, whether or not the collision occurred in consequence of, or can properly be attributable to the negligence or misconduct of the steamer Pacific. And this inquiry is necessary, in order to determine the question of inevitable accident. The rule is well settled in cases of this description, that the libelants must not only show that the collision was occasioned by the fault of the opposite party, but also, that ordinary care and diligence were used on their own part to avoid it. A failure in either respect will dismiss the libel. The law imposes the burden of proof on them, with one single exception; and that is where the libelants establish misconduct or negligence on the part of the respondent's vessel, the burden of proof is partially shifted, requiring them to show that such fault did not cause the collision. As is observed by Mr. Justice Nelson, in Newton v. Stebbins, 10 How. [51 U. S.] 605: "If every proper precautionary measure was carefully and timely taken by the steamer to pass the sloop Hamlet in safety, and the accident happened solely in consequence of the mismanagement and unskillfulness of the officer in charge of that vessel; then the damage can only be attributed to his own inattention and want of skill, and not to the steamer." Otherwise, if the steamer was in fault. Vide, as to similar ruling, Clapp v. Young [Case No. 2,786], and [Waring v. Clarke] 5 How. [46 U. S.] 465. In this last case, Mr. Justice Wayne, by whom the opinion of the supreme court was delivered, emphatically observes that: "In cases of collision, where the one vessel is clearly proved to have neglected a duty imposed by law, she will be held responsible for all losses, unless it also appears that the collision was not caused by such neglect." Another rule has been likewise well settled in admiralty, both in England and in this country, and that is, "that a vessel having the wind free is obliged to get out of the way of a vessel close-hauled, and the burthen of proof is on the former to show the exercise of all care and skill to prevent a collision. Vide 3 Hagg. Adm. 214; 2 Dod. 33, 86; 1 Conk. Adm. Prac. 305; St. John v. Paine, 10 How. [51 U. S.] 581. Since the introduction and application of steam in the propulsion of vessels, this rule has been so construed and enlarged as to require from steamers the use of all their power, under all circumstances, to keep clear of sailing vessels, and for this reason, that their impetus being controlled by human skill, they are considered as vessels navigating with a fair wind, or (in the language of Judge Nelson, in [St. John v. Paine] 10 How. [51 U. S.] 581), "going off large," and, therefore, bound to give way to sailing vessels beating to the windward on ei-

ther tack. Vide the cases of The Perth, 3 Hagg. Adm. 414; The Shannon, 2 Hagg. Adm. 173; The James Watt, 2 W. Rob. Adm. 277; The Birkenhead, 3 W. Rob. Adm. 82. These four cases, taken from recent English admiralty reports, in their application, strongly illustrate the rule as to steamers. In the first, the steamer Perth ran foul of the libelant's brig, while she was running at the rate of twelve miles an hour, in a dense fog, and in a track frequented by coasters. The brig was not discovered until the steamer was close upon her. The order to port helm was immediately given, but no order to stop the engines. The only question with the court was, "had the steamer done all in her power to avoid the collision?" and it was held that, considering the fog, and that the track was frequented by coasters, she ought to have reduced her speed at least one-half, or to six miles an hour; and that such precaution was due to the safety of other vessels; the Trinity masters declaring that, from their own experience, a steamer could be stopped in a little more than her own length. Here, then, the fault was that of the steamer, in not slackening her speed one-half in passing through the fog, and also in neglecting to stop her engine on first discovering the brig. In the second case, which is that of the Shannon, and was also the case of a steamer and a sail vessel, the court held, that although the Shannon made out a clear case of a compliance on her part with the rules of navigation, and proved that the sail vessel was navigating in violation of the same; yet, as the former received her impetus from steam, and discovered the latter ascending the river five miles off, she should have been then under her master's control, and was therefore bound to give way, and in not doing so, was at fault, and decreed to suffer the loss which had accrued; and this on the principle, that the steamer did not use all the necessary precaution. The third case is that of the steamer James Watt, which collided with the schooner Perseverance, while the latter was ascending and the former descending the river on a dark night. The master of the Watt, being in doubt what course the schooner would take, put her helm to port when the collision occurred. It was held, that the Watt was bound, under the circumstances (stress being laid on the doubt of the captain as to what course the schooner was in), instead of porting his helm, to have slackened his speed, until the course and situation of the other vessel were discoverable, and then to have acted according to circumstances. In the other case, that of The Birkenhead, it was held, that although the watch on board were justified in an erroneous belief, occasioned by the darkness of the night, as to the character and position of the brig with which the Birkenhead collided; yet, that the proper precaution was not taken on board of the steamer, by reversing her engine in time, and keeping it so until the fact was ascertained, whether or not the brig could be passed on either side. These cases, and others of a kindred character in the English admiralty, have been specially cited and recognized as law, and their principles adopted by the supreme court of the United States. [St. John v. Paine] 10 How. [51 U. S.] 584. The general rule is thereby established, that in all cases of collision between a sail vessel and a steamer, the latter will not be exonerated from liability, unless on proof that every precautionary measure was adopted by her to avoid a collision. And timely slackening the speed, is deemed a necessary precaution. A mere conformity to the rules of navigation will not excuse; neither can she under such circumstances, attach responsibility to the sail vessel, on showing her fault, in non-conformity to such rules, unless such fault and non-conformity, and not the steamer's want of the utmost care, was the sole cause of the accident. Steamers invoke a power in navigation, highly advantageous to trade and commerce, but at the same time perilous to other vessels, unless managed with the greatest care, and the most constant vigilance. Greater than the winds, and not so capricious, this power is ever under the guidance of experience and skill; and in their greatest speed steamers can be almost instantly stopped, by stopping their engines, or their course, "though they be so great, easily turned about, with a very small helm, whithersoever the governor listeth." The law, therefore, in tender regard to human life and property, will not sanction the use of this power, however convenient to the public, to the destruction of the rights and interests of others. In St. John v. Paine, 10 How. [51 U. S.] 557, Judge Nelson, in delivering the opinion of the supreme court, and approvingly citing The Perth and The Shannon, declares: "The obligation of steamers to avoid a collision, extends further than sail vessels, because they possess a power not belonging to the latter, even with a fair wind, the captain having the steamer ever under his command, both by altering the helm, and by stopping the engines." "Greater caution and vigilance, therefore, will be exacted of them, and, as a general rule, when meeting a sail vessel, whether close-hauled or with a free wind, the steamer must adopt such precautions as will avoid collision." The rule is imperative. The steamer must do all in her power. Any omission of a duty, under the exigency, will make her owners liable for the consequences. In Newton v. Stebbins, 10 How. [51 U. S.] 606, the same judge, announcing the opinion of the court, again declares: "The steamer was greatly to blame in not having slackened her speed (she then running from eight to ten miles an hour), as she approached the fleet of river craft." "It is manifest to common sense," says the supreme court, "that this rate of speed, under such circumstances, exposed the other vessels to unreasonable and unnecessary peril, and we adopt the remark of the court in the case of The Rose, 2 W. Rob. Adm. 3. 'That it may be a matter of convenience that steamers should proceed with great rapidity, but they will not be justified in such rapidity, to the injury of others.' " And in the case of The Genesee Chief, 12 How. [53 U. S.] 563. Chief Justice Taney ob-

serves: "A steamer having the command of her own course and her own speed, it is her duty to pass an approaching vessel at such distance, as to avoid all danger where she has room; and if the water is narrow, her speed should be so checked, as to accomplish the same purpose." The supreme court of the United States, then, have gone to the fullest extent of the English authorities, and in adopting the language of the court in The Rose, have also adopted the principle which governed that case, viz: that a rate of speed in steamers, which under the circumstances, necessarily endangers the property of others, is unjustifiable, and makes the owners responsible for the consequences.

In the case of The Rose, the night was dark and hazy, she had her lights burning, the sail vessel had none, and no vessel could be discerned at a greater distance than a quarter of a mile; and at the time of the collision the steamer was running at the rate of ten or eleven miles an hour; under such circumstances, and based upon the speed of the Rose, was the remark made by the court, as approvingly cited in Newton v. Stebbins. Time, place and circumstances, therefore, are all to be carefully considered and weighed, in the formation of a judgment as to what would constitute a legitimate speed in case of a collision. It would vary under different vicissitudes. Full speed would not be improper in an open lake, with a wide berth in daylight, or in navigating a river clear to observation and free from obstruction; while, on the other hand the greatest caution and the utmost care are essentially requisite at night, on a narrow channel, frequented by other vessels, and especially where a number are known to be anchored, or detained by stress of weather. Under such circumstances, a steamer is obligated by the law, either to stop her engine, in order to ascertain her course, or, slowly to feel her way, under no greater power of steam than that which is barely necessary for steerage purposes; and any greater rate, even where the peril is imminent, and has been foreseen, would be unjustifiable. Moreover, in the last case cited, that of The Genesee Chief, the supreme court has established a rule, that must govern in all such cases. It presents a simple alternative to steamers in meeting sail vessels, by declaring, that they must "pass approaching vessels at a safe distance if possible; or, if not possible, they must stop their further progress until the difficulty be obviated."

Such a rule, then, being authoritatively given by our highest judicial tribunal, our duty is to apply it to the facts of this case; and in doing so, a two-fold inquiry is presented, which we will briefly discuss: 1st. Was the speed of the Pacific, at the time and under the circumstances of the collision, such as to amount to a fault occasioning the accident? 2d. Was there space for her to have passed on the Canada or American side of the channel, and thereby have avoided the Fashion?

Were it not for the great discrepancy in the testimony of the officers and crew of the Pacific, as to the question of speed, the court would have very little difficulty in fixing the fact. For their testimony on that point, especially that of the engineer Hickey, is more reliable than the testimony of the other witnesses, who were not on board of the steamer. With all of them, except the engineer, it would be but a matter of opinion, and with him, it is knowledge derived from experience and observation of his machinery and the revolutions of his wheels. The libel fixes the speed at five miles an hour, and no doubt the proctor in drawing his bill, obtained this fact from that source; then fresh in the recollection of the party. The testimony adduced on the part of the libelants, varies from four to seven miles; while that of the respondents runs up from seven to fifteen miles an hour. Shepherd stood on the brig Hope, and noticed the vessels passing, and thinks the speed of the steamer between six and seven miles; but I am of opinion that the satisfactory preponderance is with the officers of the steamer, who should be best conversant of the fact, and better qualified to form a right judgment, while one of them could know the fact, if he thought proper to have directed his attention at the time to the subject. There can be no doubt, that until she was abreast of the Virago, her speed was as usual, about fifteen miles an hour; and that then, for the first time, observing the peril to which she was exposed, she checked her speed, and, in the intervening space between that vessel and the Hope (they being a quarter of a mile apart), the steamer was carefully worked by hand; and "hooked on" again as she rounded the Hope, and not a minute before the accident. Her speed, therefore, between the Virago and the point of collision, becomes the important question. Anterior to this, there could be no fault in her full speed, as it endangered not the property of others; and she was not obligated to check or change until the necessity was apparent, when, abreast of the Virago, the captain and the mate first discovered their vicinage to the fleet of sail vessels, and observed the brig ascending half a mile off. Our attention, therefore, is limited to the testimony as to her speed in that space. Captain Goodsell swears: "On passing the Virago, we checked our speed, by backing and reversing the engine; and at the time of the collision, the Pacific was passing the land at the rate of four or five miles an hour, the current being there four miles an hour." Gooley, the captain of the Virago, swears: "That he heard the bell ring to stop the engine, when the Pacific passed the Virago." Hickey, the engineer, on whom I most rely, swears: "Between the Virago and the Hope, the steamer was passing the land at the rate of five miles an hour, with a current of four miles. Her speed had been checked a few minutes before the collision took place. The engine was stopped and backed, and I worked her very slow by hand, with no greater motion than a good steerage way, making but seven or eight revolutions of the wheel. Before she was checked, she was running at

the rate of fourteen or fifteen miles an hour. 'Hooked on', just before the crash, and stopped the engine at the same time. Her speed but one mile an hour." Fish, the mate who had the temporary command, swears: "When we got near the Virago, I ordered the engine reversed and backed, almost stopping her headway; and her speed did not exceed four miles an hour from that time till the collision," including the current. Dumont, second mate, swears: "On nearing the Virago, we reversed our engine, and slackened our speed from three to five revolutions, and continued so until the collision. Passing the land at four miles an hour, and about a mile an hour was sufficient steerage way." Considering the official position occupied by these witnesses, the one captain, who ought to know; his two mates, who had every opportunity of knowing; and the engineer, whose especial function was to direct the machinery, so as to attain with safety a certain power as to speed, all of whom had ability and experience to form a correct judgment, and all concurring that the speed did not exceed, including the current, five miles an hour; and the fact is satisfactorily settled, that her impetus at the time did not exceed more than what was necessary for steerage purposes. For if the current was four miles, some motion of the machinery was necessary, to enable the wheelsman to guide the ship, and move her through the perils by which she was surrounded. All agree that the night was dark—no moon or starlight—and objects but dimly discerned at a few rods' distance. Her duty then was to move cautiously, not to return, but to feel her way in her downward progress, and without absolutely anchoring in the stream. She must exercise some power to enable her to avoid a collision. I do not question the integrity of these witnesses, and I confide in their ability to give a reliable estimate as to this very important point. Had the testimony been otherwise, had the speed exceeded that which was merely necessary as steerage power, had her officers neglected the precaution of reversing her engine and stopping her headway, when off the Virago, and when they were first apprised of the peril ahead, the steamer would have been grossly in fault, and under no pretence could claim the protection of this court.

The next question is, whether there was room for her to have passed on either side of the Hope. Here there is great discrepancy in the testimony. While the crew of the Fashion testify positively that there was such an open space on the Canada side, and there is no doubt but what other steamers passed both, shortly before and shortly after the collision, and while the Blossom reached the light-house on the American channel; yet Goodsell and Fish, with whom the responsibility of navigating the steamer rested, testify that the latter channel was blocked up, and that although there was an open space on the Canada side, yet there was danger of running aground. From this discrepancy, as to this point, I am not able to declare the course of the steamer a fault. How much soever we know the fact now, yet, at the time, either passage seemed hazardous to the officers of the steamer. I am of opinion, therefore, that the collision was an inevitable accident, resulting from the darkness of the night, and is not attributable to the fault of either party. Both, from the preponderance of the testimony, did all in their power, all that was called for under the circumstances; both vessels were properly manned and skillfully managed, and both used every precaution that could be used under the circumstances to escape the catastrophe which occurred. Under such circumstances, the settled rule in the United States is the rule of the admiralty in England, and not the rule which prevails among the maritime states of the continent of Europe. That rule has not merely been cited and recognized by the supreme court of the United States, as by Woodbury, J., in Waring v. Clark, but expressly adopted and directly applied. Vide [Smith v. Condry] 1 How. 28, 30; [Waring v. Clark] 5 How. [46 U. S.] 503; and [Stairback v. Rae] 14 How. [55 U. S.] 538. In the last case, that of Stairback v. Rae, after citing the English and the two preceding American cases, and the continental rule, Judge Nelson, who delivered the unanimous opinion of the supreme court, says as follows: "We think it more just and equitable, and more consistent with sound principles, that where the loss happens from a collision which is the result of inevitable accident, without the negligence or fault of either party, that each should bear his own loss. There seems no good reason for charging one of the vessels with a share of a loss resulting from a common calamity beyond that happening to herself, when she is without fault, and therefore, in no just sense, is responsible for it." This reverses the New England decision, and the libel, therefore, must be dismissed, with costs.

[For a subsequent proceeding, see Case No. 17,155.]